563 So.2d 385 (1990)
In the Matter of WOODROW WILSON CONSTRUCTION COMPANY, INC. and Mr. John Schwegmann, Schwegmann Giant Super Markets, Inc.
No. CA 89 0442.
Court of Appeal of Louisiana, First Circuit.
May 30, 1990.
George K. Anding, Jr., Ranier & Anding, Baton Rouge, for appellants Woodrow Wilson Const. Co., Inc., John Schwegmann and Schwegmann Giant Super Markets, Inc.
Roland T. Huson, III, General Counsel, Dept. of Environmental Quality, Baton Rouge, for appellee State of La.
Before EDWARDS, LANIER and FOIL, JJ.
LANIER, Judge.
This action is an appeal from an administrative proceeding in which the Secretary of the Department of Environmental Quality (DEQ) found violations of the Louisiana Air Quality Regulations and imposed civil penalties on the appellants. This proceeding commenced when an assistant secretary of DEQ issued a proposed penalty notice. The appellants requested a hearing on the charges. A statement of charges was filed by the Secretary of DEQ. Thereafter, an adjudicatory hearing was held before a hearing officer designated by the Secretary of DEQ. The hearing officer concluded that the appellants committed violations and recommended that civil penalties be assessed. The Secretary of DEQ *386 adopted the findings and recommendations of the hearing officer and assessed civil penalties. This appeal followed.

FACTS
In January of 1987, Schwegmann Giant Super Markets, Inc. (Super Markets) bought a 14.5 acre tract of land located on the corner of Leon C. Simon Boulevard and Franklin Avenue in Orleans Parish, Louisiana. This tract of land was known as the Old American Standard plant site. There were four old buildings located on the tract. One of these buildings (referred to as Building 3-B) had transite boards on its roof. Transite boards are made partially of asbestos. At all times pertinent hereto, John F. Schwegmann was the Chief Executive Officer of Super Markets.
Super Markets decided to demolish the buildings on the property and solicited bids for this work. The demolition contract was awarded to Woodrow Wilson Construction Co., Inc. (Wilson). Wilson subcontracted the work to Leroy Mitchell d/b/a L & M Demolition and Hauling. Greg Gauthier was assigned by Wilson as the superintendent for the project and was overseer for the work done by Mitchell.
Prior to commencement of the work, Gauthier inspected the buildings and found that transite boards were located on the roof of Building 3-B. Building 3-B had brick walls 16 to 24 inches thick. On or about February 16, 1987, Gauthier called DEQ and spoke with Greg Gasperecz. Gauthier advised Gasperecz that Wilson's inspection of the site revealed the presence of transite boards and that the demolition plans contemplated that the transite boards would be removed intact and by hand. Gasperecz advised Gauthier that if transite boards were removed whole, the board (and the asbestos therein) was considered nonfriable, and DEQ required no notices, permits, forms or special policies for such removal. Gauthier further advised Gasperecz that if other asbestos was discovered as work progressed, Wilson would call DEQ for further advice.
On February 19, 1987, Mitchell commenced demolition work on the site. The transite boards on Building 3-B were removed whole and by hand. By Saturday, February 21, 1987, approximately one-half of the transite boards on the roof of Building 3-B had been removed.
On February 21, 1987, Gauthier did not go to the job site. However, Mitchell worked that day. Mitchell had a crane with a wrecking (headache) ball which was used to knock down walls. Mitchell instructed the operator of the crane to knock down the brick walls on Building 3-B in the area where the transite boards had been removed from the roof. Mitchell then left the site. When he returned, he discovered that the crane operator had knocked down portions of the wall which caused many transite boards to fall and break. The asbestos in broken transite boards is considered friable for purposes of DEQ's regulations. Mitchell testified he ordered his crane operator to stop operations when he discovered this. However, he did not report this incident to Gauthier until Gauthier arrived at the job site on Monday, February 23, 1987.
When Gauthier arrived at the job site on that Monday, Mitchell was working on Building 3-D, a metal Quonset hut, not Building 3-B. Mitchell advised Gauthier about what happened to Building 3-B, and Gauthier inspected the area himself. Gauthier then notified Ken Gardner, Wilson's architect and project coordinator, about the problem. Apparently, on February 23, 1987, Gardner advised Kurt Wilson, Wilson's vice-president, about the problem. Kurt Wilson ordered all operations to cease around Building 3-B and directed that DEQ be contacted to find out what needed to be done to get the broken transite boards removed.
On February 23, 1987, William H. "Bill" Davis, the head of the Hazardous Air Pollutant Section of the Air Quality Division of DEQ, received a phone call from Michael Keabeney who complained that "the building was being demolished with a headache ball as opposed to transite panels being *387 taken down."[1] Davis testified that Pardeti Raol of DEQ's Metairie office was requested to go out to the site.
Gauthier testified that on Wednesday, February 25, 1987, he received a phone call from the Health Department of the City of New Orleans (NO) concerning a rodent inspection for the job site. At about 10:00 a.m. on February 26, 1987, the NO Health Department inspected the site and stopped all work on the site. In Exhibit DEQ # 9 (which is a June 11, 1987, letter from appellants' attorney to Davis) appears the following:
On or about Thursday, February 26, 1987, Mr. Gauthier spoke with a Mr. Raol with the Air Quality Division in Metairie regarding the appropriate DEQ forms.
. . . . .
On Friday, February 27, 1987, Greg Gauthier spoke with Mr. Gasperecz again, who told Mr. Gauthier the procedure to follow in removal of the broken transite material. On this date, Wilson's Ken Gardner met with Mr. Davis to obtain the information and applications required to remove friable asbestos material on the job. At that time, Mr. Davis advised that he could actually be at the jobsite on Monday, March 2.
. . . . .
On Monday, March 2, a meeting was held at the jobsite with Mr. Davis and representatives of the Board of Health. The requisite Notice of Intention for Demolition or Renovation was hand-delivered to Mr. Davis on that date, describing the method to clean up the damaged transite. At that meeting, Wilson again expressed its intention to cooperate fully and comply with all DEQ regulations. The material was subsequently removed without further incident.
The Notice turned in by Wilson provided, in pertinent part, as follows:
All friable asbestos will be removed according to D.E.Q. regulations and OSHA standards 1910.1001-ASBESTOS using the wet method, including all protective equipment and properly labeled leak proof containers. As specified by OSHA standards, material will be transported to an approved disposal facility.

PROCEDURAL FACTS
By letter dated March 13, 1987, Davis, on behalf of DEQ, advised Mitchell as follows:
The results of this investigation would appear to indicate that there may have been deliberate violations of Subpart F in Part IV of the Louisiana Air Quality Regulations. Documents on hand would indicate that the owner knew back in January that friable asbestos was present in the buildings and that transite material (cement/asbestos) needed to be handled in some special manner to prevent fiber release to the atmosphere during removal. Also there seems to be evidence that the owner/operator was aware of the requirement to notify the Air Quality Division before starting the demolition job. Failure to abide by the regulations and public input has resulted in enforcement type action relative to this job.
Apparently, a meeting concerning these claims was held on April 15, 1987. By letter dated April 28, 1987, Gus Von Bodungen, assistant secretary for DEQ, advised John Schwegmann as follows:
Pursuant to our informational meeting on April 5, 1987, the Air Quality Division has reason to believe that the initial act of demolishing the old American Standard Plant site at Leon Simon Blvd. and Franklin Avenue violated Section 81.3(d)(1) of Subpart F from Part IV of the Louisiana Air Quality Regulations and Section 1087 of the Environmental Quality Act. Specifically we believe the act of demolishing was not preceded with the Notice of Intent to Demolish.
For the reason stated above we find it necessary to institute enforcement action in respect to this alleged violation.
*388 Apparently, another meeting concerning this claim was held on May 28, 1987.
On July 24, 1987, DEQ issued a proposed penalty notice to Super Markets which provided, in pertinent part, as follows:
FINDINGS OF FACT
I.
Schwegmann Giant Super Markets is the owner of the Old American Standard Plant Site located in New Orleans, Orleans Parish, Louisiana.
II.
Investigations by the Department, in response to complaints, revealed that demolition of the buildings at the American Standard Plant was in progress on March 2, 1987. The investigations also revealed that friable asbestos and asbestos deemed friable was present in the buildings and that the Respondent failed to properly notify the Department before demolition of the buildings was started. These are violations of Louisiana Air Quality Regulations Sections 81.3(d)(1) and (4) of Subpart F, Part IV and of Section 1087 of the Act.
III.
A civil penalty under Section 1073 E of the Act may be assessed for the violations described hereinabove.
IV.
Having considered the factors set forth in Section 1073 of the Act, and in light of all presently known facts and circumstances in this matter, a civil penalty in the amount of $2,500 would be appropriate, equitable, and justified.
On August 5, 1987, DEQ sent a similar notice to Wilson. The record before us does not show that a proposed penalty notice was sent to John Schwegmann individually. On August 21, 1987, Super Markets, Wilson and John Schwegmann filed a written request for a formal hearing.
On February 23, 1988, the Secretary of DEQ filed the following statement of charges against Wilson:
I.
On or about March 2, 1987, Respondent caused or allowed the demolition at the Old America [sic] Standard Plant of a building which contained friable asbestos materials and failed to properly notify the department prior to such demolition.
II.
The above cited was in violation of the Louisiana Air Quality Regulations, Sections 81.3(d)(1) and (4) of Part IV, Subpart F and Section 1087 of the Environmental Quality Act.
The record before us does not contain similar statements of charges against Super Markets or John Schwegmann. However, Wilson, Super Markets and John Schwegmann, through counsel, participated in a prehearing conference and the hearing.
The hearing was held on August 12, 1988. Prior to taking evidence, the hearing officer made the following statement:
A statement of charges was issued on the Respondents by the Department on February 23, 1988. In the Statement of Charges, the Respondent is charged with causing or allowing the demolition at the Old American Standard plant of a building which contained friable asbestos material and failed to promptly notify the Department prior to such demolition. The Department is alleging that this is in violation of the Air Quality Regulations and also Section 10.87 of the Environmental Quality Act.
On November 1, 1988, the hearing officer issued his recommended findings of fact, conclusions of law and sanctions which provided in pertinent part, as follows:
9.
Demolition work at the site began on Thursday, February 19, 1987, with the transite boards being removed intact by hand.

*389 10.
On Saturday, February 21, 1987, a wrecking ball was utilized by L & M in the demolition at the site, resulting in the collapse of a roof and the smashing of many sheets of transite. Broken transite boards are friable asbestos.
11.
Utilization of the wrecking ball was inconsistent with the demolition procedure Greg Gauthier and Greg Gaspercez [sic] had discussed.
12.
On February 23, 1988, the Department received a complaint relative to the manner in which buildings at the site were being demolished.
13.
New Orleans health officials stopped the demolition on February 26, 1988, due to the fact that respondents had not obtained a rodent inspection at the site prior to commencing demolition. While at the site, the officials commented on the broken transite to a Wilson representative.
14.
On Friday, February 27, 1987, a Wilson representative, Ken Gardner, met with Bill Davis from the Department to obtain information and necessary forms required for removal of the broken transite.
15.
On Monday, March 2, 1987, during an on-site inspection by the Department and New Orleans health officials, a Wilson representative gave the Department a completed Notice of Intention to Demolish form.
CONCLUSIONS OF LAW
1.
Respondents Schwegmann and Wilson caused or allowed the demolition of a building initially containing non-friable asbestos material.
2.
During the course of that demolition, Respondents, as a result of negligence, or negligence that can be imputed to them, caused or allowed some of the non-friable asbestos material to become friable.
3.
At the time of its creation, the friable material became subject to the Department's regulations, specifically, Section 81.3(d)(1) of the Louisiana Air Quality Regulations.
4.
Timely notification of the demolition was not given to the Department as required by Section 81.3(d)(1) of the Louisiana Air Quality Regulations.
5.
Once the asbestos became friable, Respondents did not immediately comply with the provisions of Section 81.3(d)(4) of the Louisiana Air Quality Regulations in order to prevent emissions of particulate asbestos material to outside air.
6.
Respondents violated Section 1087 of the Environmental Quality Act in that they violated regulations adopted by the Secretary pursuant to Part III (Louisiana Air Control Law) of the Act by failing to timely notify the Department of a demolition involving friable asbestos and failing to comply with regulatory requirements for prevention of emissions of particulate asbestos material to outside air.
The hearing officer recommended a $4,865 civil penalty for Wilson and a $4,865 civil penalty for Super Markets and John Schwegmann. On November 4, 1988, the Secretary of DEQ adopted the hearing officer's recommendation.
This appeal was filed on November 23, 1988.

*390 FAILURE TO GIVE TIMELY NOTICE OF INTENT TO DEMOLISH

(Assignment of error A)
The appellants assert that the "conclusion of the secretary, that timely written notification of intent to demolish [as required by Sec. 81.3(d)(1) of the La. Air Quality Regulations] was not given, is manifestly erroneous; and misconstrues the facts of this case, the purpose of the regulation and its only reasonable interpretation under these facts." DEQ responds with the following argument:
The facts of this case make it clear that proper advance notice was not given. The wrecking ball that caused the roof to collapse was used on February 21, 1987, which caused many of the transite panels to be smashed and broken. No proper notice of appellants' intention to demolish was filed prior to March 2, 1987, some nine (9) days after the fact of the creation of friable asbestos from the transite panels. (Record pp. 50, 51).
It necessarily follows that timely written notice of the intent to demolish was not given. The hearing officer's and the secretary's conclusion that the required advance written notice was not given is fully supported by substantial evidence contained in the record when viewed as a whole. La.R.S. 49:964(G)(6). Therefore, the conclusion of the secretary should be upheld upon review by this Honorable Court.
La.R.S. 30:2057(A)[2] provides as follows:
A. No person shall:
(1) Discharge air contaminants or noise pollution into the air of this state in violation of regulations of the secretary or the terms of any permit, license, or variance issued hereunder.
(2) Violate any rule or regulation adopted by the secretary under this Chapter.
The appellants were found in violation of Section 81.3(d)(1) of the Louisiana Air Quality Regulations because "[T]imely notification of the demolition was not given to ..." DEQ.
Louisiana Administrative Code (LAC) 33:III.2601.D.1 and 2[3] (formerly Sections 81.3(d)(1) and (2) of the Louisiana Air Quality Regulations and hereinafter referred to as paragraphs D.1 and D.2) provide as follows:
D. Demolition and Renovation. The requirements of this Subsection shall apply to any facility owner/operator and prime contractor of a demolition or renovation operation who intends to demolish or renovate any facility containing friable asbestos material. The owner/operator is responsible for determining the presence of asbestos....
1. Written notice of intention to demolish or renovate shall be provided to the administrative authority by the facility owner/operator or the prime contractor. Such notice shall be postmarked or delivered at least 10 days prior to commencement of demolition, or renovation except as provided in Paragraph D.2. Such notice shall include the following information:
a. Name of facility owner/operator and prime contractor.
b. Address of facility owner/operator and prime contractor.
c. Telephone number for facility owner/operator and prime contractor.
d. Responsible representative of facility owner/operator and prime contractor.
e. Description of the facility to be demolished or renovated, including the size, age and prior use of the facility, *391 and an estimate of the amount of friable asbestos material to be removed.
f. Address or location of the facility, including zip code.
g. Scheduled starting and completion dates of demolition or renovation.
h. Specific plan for asbestos removal.
i. Specific plan for asbestos disposal.
j. The name, telephone number, address and location of the waste disposal site where the asbestos waste will be deposited.
2. Emergency demolition/renovation operations require telephone notification followed by a letter encompassing the notification requirements of Paragraph
D.1. (Emphasis added)
LAC 33:III.2599 defines an emergency demolition/renovation operation as follows:
Emergency Demolition/Renovation OperationA demolition or renovation operation that was not planned but results from a sudden unexpected event. This term includes operations necessitated by failures of equipment not generally associated with routine maintenance.
A violation of La.R.S. 30:2057(A) and LAC 33:III.2601.D.1 can result in the assessment of a civil penalty by the Secretary. La.R.S. 30:2025(E). Thus, these statutes and rules are penal in nature and must be strictly construed. Gibbs Construction Company, Inc. v. State, Department of Labor, 540 So.2d 268, 269 (La.1989); International Harvester Credit Corporation v. Seale, 518 So.2d 1039, 1041 (La.1988). Courts will not construe penal statutes and rules as extending powers not authorized by the letter of the law even if such powers would be arguably within its spirit. This rule applies to administrative law and procedures. Gibbs Construction Company, Inc., 540 So.2d at 269.
Paragraph D.1 is clear and unambiguous in providing that "any facility owner/operator and prime contractor of a demolition... operation who intends to demolish... any facility containing friable asbestos material" shall give DEQ "[W]ritten notice of intention to demolish" and "[S]uch notice shall be postmarked or delivered at least 10 days prior to commencement of demolition ... except as provided in Paragraph D.2." (Emphasis added) The hearing officer correctly found as fact that "[T]ransite boards ... are non-friable and the Department [DEQ] requires no notices, permits, forms or special policies for such removal." Thus, when demolition work started on February 19, 1987, Super Markets (as owner/operator of the facility) and Wilson (as prime contractor of a demolition operation)[4]had no obligation under D.1 to give notice to DEQ.
The hearing officer correctly found as fact that L & M's (Mitchell's) negligent use of a wrecking ball in the demolition of Building 3-B caused "the collapse of a roof and the smashing of many sheets of transite", and that "[B]roken transite boards are friable asbestos". The hearing officer erred as a matter of law when he held that at the time of its creation the friable asbestos in the broken transite boards became subject to paragraph D.1.[5] At that point in time, the friable asbestos in the transite boards became subject to paragraph D.2, which provides that "[E]mergency demolition/renovation operations require telephone notification followed by a letter encompassing the notification requirements of Paragraph D.1." An emergency demolition/renovation operation is defined by LAC 33:III.2599 as an "operation that was not planned but results from a sudden unexpected event." A planned operation is defined in 33:III.2599 as follows:

*392 Planned OperationsA demolition and/or renovation operation, or a number of such operations, in which the amount of friable asbestos material that will be removed or stripped within a given period of time can be predicted. Individual nonscheduled operations are included if a number of such operations can be predicted to occur during a given period of time based on operating experience.
It is obvious when paragraph D.1 is read in pari materia with paragraph D.2 that paragraph D.1 applies to planned demolitions and paragraph D.2 applies to unplanned demolitions. The facts of this case unequivocally show that Wilson planned to remove the transite boards intact by hand (as nonfriable asbestos) and that paragraph D.1 did not apply to this type of planned demolition. The facts also unequivocally show that the collapse of the wall of Building 3-B and the subsequent breaking of the transite boards were not planned but resulted from a sudden unexpected event (the negligence of the crane operator in failing to follow and/or understand his instructions from Mitchell). The evidence shows that during the period from the time of the accident on February 21 through March 2, 1987, no further demolition work was done on Building 3-B and no attempt was made to remove (demolish) the broken transite boards. Wilson gave telephone notification to DEQ and followed it up with a written notice before continuing demolition on Building 3-B or removing the broken transite.
The interpretation of paragraph D.1 urged by DEQ would allow a retroactive application of the regulation, would render most of paragraph D.2 meaningless and would yield an absurd result. DEQ asserts that when the wall fell down and broke the transite boards, paragraph D.1 became applicable and, since the respondents had not at that point in time given a 10 day prior written notice, they were in violation of the regulation. DEQ concedes that prior to the moment the wall fell down, the respondents were not in violation. The fallacy in the DEQ argument is that prior to the time that the transite boards were broken, respondents had no intent to demolish a facility containing friable asbestos material. The intent to demolish a facility containing friable asbestos material was formed after the wall collapsed and the boards were broken. No demolition took place after that intent was formed until telephonic and written notice was given to DEQ. It would be absurd to require the giving of a notice of intent prior to the time that the intent existed.
This assignment of error has merit.

FAILURE TO TAKE IMMEDIATE ACTION TO PREVENT EMISSIONS OF ASBESTOS

(Assignment of error B)
The appellants contend DEQ erred by finding that they did not immediately take action to prevent emissions of particulate asbestos material because the claim "was not pursued by the department; and is outside the scope of the charges filed against appellants and as to which they were notified and allowed to prevent evidence." Appellants also assert the conclusion of the hearing officer is manifestly erroneous.
The evidence shows that the asbestos in the transite boards became friable on February 21, 1987; Wilson and Mitchell commenced "wetting down" the broken transite boards in place on February 26, 1987; and Wilson and Mitchell continued to "wet down" the broken transite boards until they were removed at an unspecified time after March 2, 1987. Based on these facts the hearing officer concluded that "[R]espondents did not immediately comply with the provisions of Section 81.3(d)(4) of the Louisiana Air Quality Regulations in order to prevent emissions of particulate asbestos material to outside air."[6]
LAC 33:III.2601.D.4 (formerly Section 81.3(d)(4) and hereinafter referred to as paragraph D.4) provides as follows:
*393 4. Procedure for Preventing Asbestos Emissions. The following procedures shall be used to prevent emissions of particulate asbestos material to outside air:
a. Friable asbestos material in any facility shall be removed prior to wrecking or dismantling of the facility. Removal of friable asbestos materials used on pipe, duct, or structural members which are encased in concrete or other similar structural material, is not required prior to demolition, but such material shall be adequately wetted whenever exposed during demolition.
b. Friable asbestos materials to be stripped or removed from any facility shall be adequately wetted prior to stripping or removing except as provided in Subparagraphs D.4.d. and D.4.f.

c. Facility components that are covered or coated with friable asbestos materials may be taken out as units or in sections, provided the friable asbestos materials exposed during cutting or disjointing are adequately wetted. Such units or sections shall be carefully lowered to grade.
d. The stripping or removing of friable asbestos materials used on any facility component that has been removed as a unit or in sections as provided in Subparagraph D.4.c of this Section shall be performed in accordance with Subparagraph D.4.b of this Section. Rather than comply with the wetting requirement, a local exhaust ventilation and collection system may be used to prevent emissions to the outside air. Such local exhaust ventilation systems shall be designed and operated to capture the asbestos particulate matter produced by the stripping or removal of friable asbestos material. There shall be no visible emissions to the outside air from such local exhaust ventilation and collection systems.
e. All friable asbestos materials that have been removed or stripped shall be adequately wetted to ensure that such materials remain wet during all remaining stages of demolition or renovation and related handling operations. Such material must be lowered without impact to grade or lower floor. Such materials that have been removed or stripped more than 50 feet above grade, except those facility components removed as units or sections, shall be transported to grade via dust-tight chutes or containers.
f. Local exhaust ventilation and collection systems may be used, instead of wetting as specified in Subparagraph D.4.b, to prevent emissions of particulate asbestos material to outside air when damage to equipment resulting from the wetting would be unavoidable during renovation operations. Such local exhaust ventilation systems shall be designed and operated to capture the asbestos particulate matter produced by stripping or removal of friable asbestos material. There shall be no visible emissions to the outside air from such local exhaust ventilation and collection systems. (Emphasis added)
LAC 33:III.2599 defines a facility as "[A]ny institutional, commercial, or industrial structure, installation, or building." LAC 33:III.2599 defines remove and strip as follows:
RemoveTo take out friable asbestos materials from any facility.
. . . . .
StripTo take off friable asbestos materials from any part of a facility.
Paragraph D.4.(a) provides that "[F]riable asbestos material in any facility shall be removed prior to wrecking or dismantling of the facility." The verb "shall be removed" is in the future tense. This provision obviously contemplates a planned operation. Further, in the instant case, there was no friable asbestos material in Building 3-B prior to the commencement of the dismantling of the building (facility); friable asbestos material only existed at Building 3-B after a sudden unexpected event occurred on February 21, 1987.
*394 Paragraph D.4.(b) provides that "[F]riable asbestos materials to be stripped or removed from any facility shall be adequately wetted prior to stripping or removing." DEQ does not assert that the words "stripped" and "removed" as used in this paragraph, and as defined in LAC 33:III.2599, contemplate an accident (unplanned operation resulting from a sudden unexpected event). This provision also contemplates a planned operation because it uses the future tense verb form of "to be stripped or removed". This provision does not require that friable asbestos existing at a facility (building), prior to or during demolition, must be immediately wetted down; it only requires that existing friable asbestos "shall be wetted down prior to stripping or removing". (Emphasis added) The word "immediately" does not appear anywhere in paragraph D.4. Thus, paragraph D.4.(b) could apply in the instant case only after the transite boards were broken and the asbestos became friable. At that point in time Super Markets and Wilson were obligated only to "wet down" the broken boards "prior to ... removing".[7] This was done commencing on February 26, 1987.
Paragraph D.4.(e) must be construed in pari materia with paragraphs D.4.(a) and (b). Paragraph D.4.(a) requires that friable asbestos material be removed prior to dismantling a facility; paragraph D.4.(b) requires that the friable asbestos be wetted prior to removal; and paragraph D.4.(e) requires that after the friable asbestos is removed, it must remain wet until finally disposed of. The evidence shows this was done. DEQ seems to argue that the appellants had an obligation to wet down the broken transite panels immediately after they were negligently (accidentally) broken. Very simply, paragraph D.4 does not so provide. It is a penal regulation and must be strictly construed.
This assignment of error has merit.[8]

DECREE
For the foregoing reasons, the rulings of the hearing officer, which were adopted by the Secretary of DEQ, that the appellants violated LAC 33:III.2601.D.1 and 4[9] are reversed, and the charges against the appellants are dismissed with prejudice. DEQ is cast for all costs, in the amount of $532.00.
REVERSED AND RENDERED.
NOTES
[1] Davis testified that "Keabeney, as I understood it, was one of the ones that bid on the job." Transcript page 83.
[2] Pursuant to House Concurrent Resolution No. 247 of the 1987 Regular Session and on authority of La.R.S. 24:253, La.R.S. 30:1087 of Part III of Chapter 11 of Title 30 of the Revised Statutes of 1950 was redesignated as La.R.S. 30:2057, of Chapter 3 of Subtitle II of Title 30. The substance of the applicable statutes and regulations have not been changed, only their designations.
[3] The text of LAC 33:III.2601 of the Louisiana Air Quality Regulations is not part of the record; however, we will take judicial cognizance of the text of this rule. See La.R.S. 49:966; La.R.S. 30:2011; La.R.S. 30:2019; La.R.S. 30:2054; State v. Corkran, 448 So.2d 1346 (La.App. 3rd Cir.), writ denied, 450 So.2d 970 (La.1984). See also La.C.E. art. 202.
[4] We note in passing that John Schwegmann, individually, was not the owner/operator of the facility or the prime contractor of the demolition. Nevertheless, the DEQ hearing officer and secretary found him subject to the regulation.
[5] Because we resolve this assignment of error on other grounds, it is unnecessary for us to rule on the factual and legal conclusions of DEQ that "Respondents" (Wilson, Super Markets and John Schwegmann) as a result of their independent negligence, or negligence imputed to them, caused or allowed non-friable asbestos material to become friable.
[6] DEQ concedes in brief that "[A]ppellants were not charged with nor found to have committed an emission violation." Rather, DEQ asserts appellants "were charged and were found to have failed to take measures designed to prevent such emissions."
[7] It would appear that by definition the broken transite boards were not stripped from Building 3-B.
[8] Because we find that the facts show no violation of paragraph D.4 as a matter of law, it is unnecessary to address the insufficient notice claim of the appellants.
[9] Because we find merit to assignments of error A and B, it is unnecessary for us to address assignments of error C and D which pertain to the validity of the civil penalties that were imposed.